Thomas R. Kayes (Cal. Bar. No. 327020)
tom@kayes.law
LAW OFFICE OF THOMAS R. KAYES, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
tel: 708.722.2241

*Attorney for Plaintiff Mesachi*

# United States District Court
## for the Northern District of California
## San Francisco Division

| | |
|---|---|
| Plaintiff Edmond Mesachi, | Case No. 20-cv-3046 |
| v. | Complaint; Demand for Jury Trial |
| Defendant Postmates Inc. | |

## Introduction

1.    This is a wage theft case.

2.    Postmates Inc. is an on-demand delivery company.

3.    After creating an account with Postmates, consumers can order meals from restaurants, or groceries and other items from stores, using the company's website or smartphone app.

4.    Postmates delivers those items right away.

5.    The workers who do the delivering are Postmates "Fleet."

6.    The deliveries these workers make aren't just in the ordinary course of Postmates's business—they are Postmates's business.

COMPLAINT - 1

7.     Under California law, that makes the Fleet workers Postmates's employees. Cal. Labor Code § 2750.1(a); *Dynamex Operations W., Inc. v. Superior Court*, 4 Cal.5th 903, 955 (Cal. 2018).

8.     Postmates, like all employers, owes its employees minimum wage, overtime pay, sick leave, and a host of other benefits.

9.     Yet Postmates pays its Fleet less than it should and offers no benefits. It instead misclassifies its workers as independent contractors.

10.    Edmond Mesachi is one of Postmates's misclassified workers.

11.    He's worked for Postmates since 2016, making hundreds of the deliveries that are the company's only real product.

12.    For his effort, he has been underpaid and denied the other benefits due him under law.

13.    He now sues Postmates to claim what he is owed.

## Parties

14.    Plaintiff Edmond Mesachi is an individual living in the Los Angeles area.

15.    Defendant Postmates Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

## Jurisdiction & Venue

16.    The court has federal-question jurisdiction over this case based on Mesachi's federal Fair Labor Standards Act claim and supplemental jurisdiction over Mesachi's remaining claims because they arise from the same basic facts as the federal claim.

17.    Venue is appropriate under 28 U.S.C. § 1391(b)(1) because Postmates is the only defendant and it resides in this judicial district.

18.    Instradistrict Assignment should be to the San Francisco Division because Postmates is based in San Francisco.

## Allegations

COMPLAINT - 2

*Postmates*

19.     Postmates was founded in 2011 as an on-demand delivery company. It now serves 4,200 cities, covering over 80% of U.S. households.

20.     Postmates's marketing shows that its business is delivery. Its website repeatedly offers consumers fast delivery from local merchants:

## Order from local favorites near you.

Whatever you want, we get it. Order delivery for yourself or with friends and watch in real-time as your Postmate brings you all the things you love.

Enter your phone number to get the app

**GET THE APP**

– and –



*How Postmates Makes Money*

21.     The way Postmates makes money is consistent with its marketing.

COMPLAINT - 3

22.     Postmates gets paid for making deliveries.

23.     Consumers create accounts with Postmates by forking over their names, addresses, preferences, and payment information (like a credit card number).

24.     A consumer can log into their Postmates account from a smartphone or computer, click on stores in their area, see what those stores have to offer, add items to a virtual shopping cart, schedule a time to have those items delivered, and pay.

25.     Postmates's revenue comes almost exclusively from what consumers pay for deliveries.

*The Fleet*

26.     To make deliveries happen, Postmates employs a Fleet of workers.

27.     To join the Fleet, a worker must create a Fleet-account with Postmates via its website or a Fleet-specific version of its smartphone app.

28.     Using the app, the worker gives Postmates his or her personal information, consents to a background check, accepts Postmates "Fleet Agreement," and provides a bank account for direct deposit of wages.

29.     Postmates sends new workers a Postmates charge card to pay for, and an insulated bag to transport, consumer orders.

30.     The worker can then log onto the app and accept any delivery jobs that Postmates sends to that worker.

31.     If the worker accepts a job, the worker must then travel to the store, pick up the order, and deliver it to the consumer.

32.     Postmates pays its workers on a per-job basis.

33.     Postmates reserves the right to change its payment formula at any time.

34.     Currently, in Los Angeles, the published payment formula is this:

COMPLAINT - 4

**Delivery Earnings**

| Rate Per Pickup | Rate Per Dropoff | Rate Per Minute | Rate Per Mile |
|---|---|---|---|
| $1.40 | $0.70 | $0.07 | $0.69 |

35.     By "Per Minute," Postmates only means minutes between the time a worker accepts a delivery job and the drop-off for that job. Postmates does not pay for the time workers are waiting for jobs.

36.     By "Per Mile," Postmates only means distance—as the crow flies—between the merchant and the consumer. Postmates does not count other mileage.

37.     Postmates does not pay workers' business expenses, like vehicles, insurance, parking, cellphones, or data plans.

38.     And Postmates makes no effort to calculate or pay overtime to workers who work more than 8 hours in a day, 40 hours in a week, or six days in a row.

39.     Postmates also refuses to offer sick time or meal and rest breaks.

40.     Postmates also fails to provide wage statements to workers from which they can discern their gross and net wages, and the hourly rate at which they are being compensated for their work.

*Fleet Workers are Not Independent Businesses*

41.     Postmates Fleet workers are not independent transportation businesses or genuine independent contractors.

42.     First and foremost, a genuine business, or a genuine independent contractor, would make more than minimum wage. Fleet workers don't.

43.     Fleet workers have no independent brand. To the stores they pick up from, and the consumers they drop off with, they are *Postmates*; not an independent business.

COMPLAINT - 5

44.     If a consumer is displeased with a delivery, the consumer contacts Postmates to make things right; not the worker.

45.     When a consumer has a great experience, that leads to increased business for Postmates; not the worker.

46.     No consumer can request a favorite Postmates Fleet member for his or her deliveries.

47.     No Fleet member can request to delivery all of a particular consumer's orders.

48.     Workers have no ability to set the prices paid by the consumer or the wages they earn from Postmates.

49.     Workers make no capital investment in material or equipment. Workers most often come with their own cars and phones and simply download an app, apply, and start working.

50.     Being a Fleet member takes no specialized skill or unique license.

51.     Workers cannot use initiative, skill, or management to increase their earnings. They cannot control if or when Postmates will offer them an order to deliver, how Postmates wants that order fulfilled, or how large that order will be.

52.     A Fleet member's only choice is to deliver the orders offered to them by Postmates for a wage set by Postmates—or not to work at all.

*Postmates's Sham "Fleet Agreement"*

53.     To work as a Fleet Member, one must sign Postmates Fleet Agreement.

54.     The agreement is designed to give Postmates arguments for use in misclassification litigation.

55.     It repeatedly claims that the workers agree that they are independent contractors.

56.     It devotes an entire section to instructing workers that they can hire subcontractors or their own employees to do deliveries.

COMPLAINT - 6

57.     This is, of course, preposterous. The meager wages paid by Postmates are too small for a single worker, much less to split between two workers.

58.     The agreement also misrepresents the nature of Postmates's business.

59.     In its consumer-facing and marketing communications, Postmates is all about delivering goods for consumers.

60.     But a delivery company is the last thing Postmates wishes to be in court, so in its agreement, Postmates says instead that it "provides and maintains an online marketplace and mobile platform."

61.     It does this so it can argue that the Fleet's work is outside the usual course of its business, an argument this Court recently deemed frivolous in a case about another, materially similar, gig economy business. *Rogers v. Lyft, Inc.*, No. 20-cv-01938-VC, at *4 (N.D. Cal. Apr. 7, 2020) ("That test is obviously met here: Lyft drivers provide services that are squarely within the usual course of the company's business, and Lyft's argument to the contrary is frivolous.").

*Edmond Mesachi*

62.     Edmond Mesachi is a Los Angeles resident who has worked for Postmates since 2016.

63.     Mesachi has worked hard for Postmates.

64.     Mesachi still works for Postmates.

65.     Mesachi primarily worked for Postmates in the City of Los Angeles and the County of Los Angeles, working at least two hours per week in the City of Los Angeles and unincorporated Los Angeles County in virtually every week he worked for the company.

66.     Mesachi frequently worked more than 40 hours in a week.

67.     Mesachi frequently worked more than 8 hours in a day.

68.     According to the 1099s issued by Postmates, Mesachi earned these amounts in each year:

COMPLAINT - 7

| Year | Amount |
|------|--------|
| 2016 | $11,122.30 |
| 2017 | $17,943.85 |
| 2018 | $30,937.38 |
| <u>2019</u> | <u>$23,276.26</u> |
| Total (through Dec. 31, 2019) | $83,279.79 |

69. Postmates has not reported to Mesachi how many miles he drove making deliveries and it did not require him to track his mileage himself. Mesachi therefore does not know how many miles he drove for Postmates.

70. Postmates does not require Mesachi to record his actual work time and does not make that information available to Mesachi.

71. Mesachi therefore cannot know for certain, without discovery, how much Postmates owes him.

72. But the data he has, extrapolated to his years of service, is enough to plausibly suggest that Postmates has violated his rights and underpaid him by tens of thousands of dollars.

73. The week of March 9, 2020 provides an example.

74. That week, Mesachi made 43 deliveries, working six out of seven days.

75. For that week, Postmates paid Mesachi $250.17.

76. The data Postmates makes available to Mesachi does not allow him to determine how many hours he worked that week. But by using the dates and times of each delivery Mesachi can estimate when each day's work ended and began. Using the time of the first and last deliveries of each day's work as the beginning and end of each day's shift, Mesachi estimates he worked 27.43 hours that week.

77. Thus, Postmates paid Mesachi roughly $9.12 per hour that week.

78.    The law requires Postmates to pay more. State law requires a minimum wage of $13 dollars per hour. And the Los Angeles Municipal Code requires Postmates to pay a minimum wage of $14.25.

79.    The amount Postmates owes Mesachi in back wages, just for that week, is about $140:

|  |  |
|---|---|
| Minimum Wage | $14.25 |
| Minimum Wage Hours | 27.43 |
| Minimum Wage Pay Required | $390.88 |
|  |  |
| Amount Paid | $250.17 |
|  |  |
| Underpayment (Los Angeles Municipal Law) | $140.71 |

80.    But even this understates how much Postmates owes Mesachi.

81.    This is because the law does not allow employers to shift their operating expenses onto their employees, especially when doing so pushes the employee under the minimum allowable wage.

82.    Mesachi drives to make his deliveries for Postmates, and so Postmates is obligated to reimburse him for the expenses of operating his car.

83.    The IRS estimates those expenses at 57.5 cents per mile.

84.    Assuming Mesachi drove 5 miles per hour that day, Postmates underpaid Mesachi by an additional $78.86.

85.    That drives his hourly rate down to just $6.25.

86.    In sum, Postmates underpaid Mesachi by more than $200 for just that one week.

87.    And Mesachi has worked for Postmates for four years.

*Mesachi Tries to Arbitrate*

88.    As required by the Fleet Agreement, Mesachi first filed his claims in arbitration.

COMPLAINT - 9

89.     As required by the Fleet Agreement, Mesachi gave Postmates notice of his desire to initiate arbitration.

90.     Mesachi simultaneously filed his arbitration demand with the American Arbitration Association.

91.     About two weeks later, the AAA sent Mesachi a letter declining to administer his arbitration due to past misconduct by Postmates. *See, e.g., Adams v. Postmates, Inc.*, 414 F. Supp. 3d 1246, 1250 (N.D. Cal. 2019).

92.     As of the date this complaint was filed, Postmates has not responded to Mesachi's notice or the AAA's letter.

93.     Postmates has therefore breached its arbitration agreement and waived its right to arbitrate.

94.     Moreover, Postmates has breached the arbitration and waived its right to arbitrate a second way.

95.     Postmates and Mesachi contractually agreed to resolve their disputes in "individual arbitration" only and to not "participate in any class and/or collective action" involving their disputes.

96.     Postmates has breached this promise by attempting to settle Mesachi's claims as part of a class action, *Rimler et al. v. Postmates Inc.*, CGC-18-567868 (Cal. Super. Ct.), now pending in San Francisco Superior Court.

97.     Rather than excuse these breaches and further delay the resolution of his claims, Mesachi has chosen to proceed in court.

## Causes of Action

### *First Cause of Action*

(Failure to Pay Minimum Wage under the Fair Labor Standards Act)

98.     Mesachi is an employee within the meaning of the Fair Labor Standards Act.

99.     Postmates is his employer.

COMPLAINT - 10

100. Postmates failed to pay Mesachi the minimum wage required by the Act for each hour of work.

101. Mesachi therefore seeks unpaid wages, liquidated damages, an injunction classifying him as an employee, and attorneys' fees and costs.

*Second Cause of Action*

(Failure to Pay Overtime Wages under the Fair Labor Standards Act)

102. Mesachi is an employee within the meaning of the Fair Labor Standards Act.

103. Postmates is his employer.

104. Postmates failed on occasion to pay Mesachi the overtime wage required by the Act when Mesachi worked more than 40 hours in a week, which he did on occasion.

105. Mesachi therefore seeks unpaid wages, liquidated damages, an injunction classifying him as an employee, and attorneys' fees and costs.

*Third Cause of Action*

(Failure to Pay Minimum Wage under California State Law)

106. Mesachi is an employee under California law.

107. Postmates is his employer.

108. Postmates failed to pay Mesachi the minimum wage required by California law for each hour worked.

109. Mesachi therefore seeks unpaid wages, liquidated damages, an injunction classifying him as an employee, and attorneys' fees and costs.

*Fourth Cause of Action*

(Failure to Pay Overtime Wages under California State Law)

110. Mesachi is an employee under California law.

111. Postmates is his employer.

COMPLAINT - 11

112.    Postmates failed to pay Mesachi the overtime wage required by California law for each hour Mesachi worked more than 40 hours in a week or 8 hours in a day.

113.    Mesachi therefore seeks unpaid wages, liquidated damages, an injunction classifying him as an employee, and attorneys' fees and costs.

### *Fifth Cause of Action*

(Failure to Pay Minimum Wage under the Los Angeles Municipal Code)

114.    Mesachi is an employee under the Los Angeles Municipal Code.

115.    Postmates is his employer.

116.    Postmates failed to pay Mesachi the minimum wage required by the Code for each hour worked.

117.    Mesachi therefore seeks unpaid wages, civil penalties, an injunction classifying him as an employee, and attorneys' fees and costs.

### *Sixth Cause of Action*

(Failure to Provide Sick Time Benefits under the Los Angeles Municipal Code)

118.    Mesachi is an employee under the Los Angeles Municipal Code.

119.    Postmates is his employer.

120.    Postmates failed to provide Mesachi sick time benefits required by the Code.

121.    Mesachi therefore seeks the value of unpaid benefits, civil penalties, an injunction classifying him as an employee, and attorneys' fees and costs.

### *Seventh Cause of Action*

(Failure to Pay Minimum Wage under the Los Angeles County Code)

1.    Mesachi is an employee under the Los Angeles County Code.

2.    Postmates is his employer.

3.    Postmates failed to pay Mesachi the minimum wage required by the Code for each hour worked.

COMPLAINT - 12

4.      Mesachi therefore seeks unpaid wages, civil penalties, an injunction classifying him as an employee, and attorneys' fees and costs.

### *Eighth Cause of Action*

(Failure to Reimburse Business Expenses under California State Law)

5.      Mesachi is an employee under California law.

6.      Postmates is his employer.

7.      Postmates utterly failed to reimburse Mesachi for expenses he incurred working for it.

8.      Mesachi therefore seeks reimbursement, an injunction classifying him as an employee, and attorneys' fees and costs.

9.      He does not seek a double recovery. In that sense, this cause of action can be viewed as pled in the alternative to the claims for unpaid wages.

### *Ninth Cause of Action*

(Failure to Provide a Compliant Wage Statement under California State Law)

10.     Mesachi is an employee under California law.

11.     Postmates is his employer.

12.     Postmates failed to provide Mesachi with a wage statement that enabled him to understand his gross and net wages and the hourly rates of pay.

13.     Mesachi therefore seeks civil penalties, an injunction classifying him as an employee, and attorneys' fees and costs.

### *Tenth Cause of Action*

(Unfair Business Practices under California State Law)

14.     By violating Mesachi's rights under federal, state, and local employment law, Postmates has committed unlawful practices under California's Unfair Competition Law.

15.     Those unlawful practices have caused Mesachi to lose money.

COMPLAINT - 13

16.     Mesachi therefore seeks restitution, an injunction, and attorneys' fees and costs.

## Prayer for Relief

17.     Mesachi prays for a judgment against Postmates including:

    a.   Unpaid wages;

    b.   Expense reimbursement;

    c.   Liquidated damages;

    d.   Civil penalties;

    e.   Restitution;

    f.   Pre- and post-judgment interest;

    g.   Attorneys' fees and costs;

    h.   An injunction requiring Postmates to treat him as an employee; and

    i.   All other relief the Court deems just.

## Jury Demand

Mesachi demands a jury trial.

Dated: May 4, 2020.                              Respectfully submitted,


/s/ Thomas R. Kayes
_____
Attorney for Plaintiff Mesachi

COMPLAINT - 14